UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | CRIMINAL ACTION |
| ) | NO. 15-MJ-06012-MPK |
| SHAYNE PARKER, ) | |
| Defendant. ) | |

ORDER ALLOWING THE
GOVERNMENT'S MOTION FOR DETENTION

April 23, 2015

KELLEY, U.S.M.J.

The complaint alleges that Shayne Parker was a felon unlawfully in possession of 50 rounds of .380 caliber CCI rounds of ammunition in violation of 18 U.S.C. § 922 (g)(1). He faces a maximum of ten years in prison.

Parker appeared before the Court for his initial appearance on March 31, 2015 and the government moved for detention under 18 U.S.C. § 3142(f)(2)(A) (risk of flight) and 18 U.S.C. § 3142 (f)(1)(D), (alleged offense committed after two qualifying

convictions).[1]   The case was continued to April 6, 2015 for a detention hearing.

At the detention hearing, the government called Agent Mattheu Kelsch of the Bureau of Alcohol, Tobacco, Firearms and Explosives.  The government admitted Agent Kelsch's affidavit in support of the complaint as an exhibit.  The Court found probable cause to believe that Parker committed the charged offense and took the matter of detention under advisement after the hearing.  The Court now makes its findings.

I. FACTS

The facts below are taken from the affidavit in support of the complaint, the testimony of Agent Kelsch, arguments of counsel, a memorandum filed by the government on April 20, 2014, a list of proposed conditions of release submitted by Parker, and the Pretrial Services Report prepared in connection with this case.[2]

About a year ago, ATF special agents in New Hampshire informed ATF agents and others in Massachusetts that they were conducting an investigation of two men, both felons, who would travel from Massachusetts, where they lived, to New Hampshire, in order to purchase firearms in New Hampshire through straw purchasers.  The two men

---

[1]At the detention hearing, the Court understood that the government moved for detention under 18 U.S.C. § 3142 (f)(1)(e) (crime involves firearm), a section which would not apply to this case,  but in its Memorandum Regarding Pre-Trial Order of Detention (#11) the government explained it was not moving under that section.

[2]The Court does not set out every fact in support of the government's case, or that the defense raised in opposition to the government's assertions, but sets out the facts that the Court found most pertinent to its decision.

were identified as Ronald Scott and the defendant, Shayne Parker.[3]

Four cooperating witnesses participated in the investigation. One of them, "CW1," told police that he had facilitated straw purchases of between twenty and twenty-five firearms for the two men, using at least three straw purchasers.[4] Two of the straw purchasers were also cooperating witnesses. CW1 said that he would "often assist Scott and Parker in transporting firearms to Dorchester or other places in Massachusetts." This witness described what the men looked like, identified their pictures, said that the men lived in Boston, said he had been to the Boston residence of Scott on one occasion, gave police telephone numbers for both men, and said that Scott would provide money for the purchase of the firearms, and Parker would contact CW1 to arrange the logistics of the transactions. Law enforcement agents saw that CW1 had the men's phone numbers on his cell phone and viewed calls between the three and text messages in which they discussed the scheme to purchase firearms.

CW1 said that on April 3, 2014, CW2 had purchased five firearms in New Hampshire for the two men from a certain gun shop. Scott and Parker were waiting in the area of the shop during the purchase. CW1 and 2 later delivered the guns to the men in the parking lot of a McDonald's restaurant in Massachusetts.

---

[3]Both men were apparently charged in federal court in New Hampshire in connection with this scheme. According to statements made at the detention hearing by the parties, the Parker's case was eventually dismissed. The Court does not know why the case was dismissed and does not consider the dismissal to be relevant here.

[4]For ease of reference, the CW's will be referred to as males.

CW1 described the car that the men often drove, a white Subaru Legacy sedan, and told the police that Scott would sit in the passenger seat while Parker drove the car.

The police verified that CW2 had purchased five firearms from the Alstead Gun Shop in New Hampshire on April 3.  In addition, records showed that CW2 had purchased three guns on March 11, 2014 from the same shop.

Law enforcement verified that a third cooperating witness, CW3, purchased three firearms for the two men on March 16, 2014, and four firearms on March 22, 2014 at the direction of CW1.  Parker rented rooms at the Keane Inn in Keane, New Hampshire on March 15 and March 21, presenting his valid Massachusetts' driver's license to register for the rooms.

A third firearm purchase was attempted on March 29, 2014 by CW3 but could not be completed.  The affidavit in support of the complaint lists the stores where guns were purchased on March 16 and March 22 and the specific guns that were purchased.  The affidavit alleges that all of the firearms from the first two transactions were subsequently transferred to Scott and Parker.

On March 22, 2014, after the four firearms were purchased by CW3, CW3 and CW1 met up with Scott and Parker, and were to follow Scott and Parker to Boston.  Scott and Parker were driving a Mustang that was registered to Parker.  En route to Boston, everyone stopped at a Dick's Sporting Goods in Keane, New Hampshire.  Scott and CW3 went into the store and video surveillance captured them inside, buying five boxes of ammunition.  Scott carried the bag of ammunition back to the car while Parker waited in

the car.

The parties made their way to an apartment in Boston provided by CW4, 233 River Street, Unit 104, where according to the complaint, Parker was present for the handling and transfer of the firearms and ammunition.

On April 14, 2014, Scott and Parker traveled to New Hampshire after CW1 arranged to give them three handguns in exchange for crack cocaine. They were arrested in New Hampshire, and Scott was found to have about 14 grams of crack cocaine on his person.

A search warrant was executed at 233 River Street, Unit 104, in Boston, on the same day Scott and Parker were arrested. A firearm and a box containing 50 rounds of ammunition were seized. The box of ammunition was one of those purchased on March 22 at Dick's Sporting Goods. Parker's fingerprint was found on the inner tray of the package.

Two of the firearms purchased by the straw purchasers and delivered to Scott and Parker were subsequently recovered by the police in Boston. The government alleges in its memorandum that the guns "were recovered in Boston connected to persons known to be street gang members by the Boston Police Department." (#11 at 4.)

Mr. Parker is 39 years old. He was born in Boston and has lived here his entire life. He appears to have had a disadvantaged childhood, living in foster homes as a child. He has a high school diploma. He has worked as a landscaper, a warehouse worker, and a tow truck driver. He appears to have had steady employment as an adult at various jobs

5

for the past several years.  His attorney recommended that he be released to live with his long-time girlfriend and mother of three of his children.  He appears to have substantial ties to the community in Boston.

Regarding his criminal record, Mr. Parker presently has an open case for malicious destruction of property but has had no other charges since 2011.  In 2011 he received a continuation without a finding for a case charging two counts of assault and battery on a police officer, resisting arrest, and disturbing the peace.  Other than those charges, he has had no other convictions since 2007, when he was convicted of offenses having to do with driving without a license.  He then has convictions from 2002 and 1997 for disorderly conduct, assault with a dangerous weapon (sledgehammer), and threats.  He received thirty days in the House of Correction for the threats.  Also, in 1997 he received two years in the House of Correction for a distributing cocaine in a school zone.  While the government correctly pointed out that his record contains many defaults, it is difficult to discern whether the defaults on his CORI establish that he has a pattern of not appearing in court.  Many of the defaults appear to be at the end of entries, for example, suggesting that he did not pay fines on time.

Defense counsel argued that the allegations of Mr. Parker's involvement with the purchasing of the guns was not supported by reliable evidence.  Agent Kelsch testified that Mr. Parker had voluntarily spoken to police and denied having anything to do with purchasing the guns, although he admitted accompanying Scott to New Hampshire, but said he thought the purpose of the trips was for Scott to sell marijuana.

6

## II. LEGAL STANDARD

Under the Bail Reform Act, a defendant may only be detained pending trial if the government establishes either by clear and convincing evidence that the person poses "a danger to the safety of any other person or the community if released," or by a preponderance of the evidence that the person poses a serious risk of flight. 18 U.S.C. § 3142(f); *United States v. Patriarca*, 948 F.2d 789, 791-793 (1st Cir. 1991). If there is some risk, the Court should consider whether a combination of release conditions "will serve as a reasonable guard." *Id.* at 791.

In determining whether suitable release conditions exist, the judicial officer must take into account the following: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the accused, including family ties, employment and other factors; and (4) the nature and seriousness of the danger posed by the person's release. 18 U.S.C. § 3142(g).  Each of these factors must be weighed, and the decision on whether to release is an individualized one.  *Patriarca*, 948 F.2d at 794.

The Government bears the burden of persuasion to establish that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991).  Where, as here, there is probable cause to believe that the defendant committed an offense having been previously convicted of two prior offenses

enumerated in 18 U.S.C. § 3142 (f)(1) (A) - ( C), which defendant here was,[5] a "rebuttable presumption" of danger and flight arises. 18 U.S.C. § 3142(e). The presumption imposes a burden of production on the defendant to come forward with "some evidence" to demonstrate that he is not a danger to the community or a flight risk. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). Without credible evidence to rebut the presumption, the presumption alone may justify detention. *United States v. Alatishe*, 768 F.2d 364, 371 (D.C.Cir. 1985). Notwithstanding this rebuttable presumption, the burden of persuasion always remains with the Government. *Jessup*, 757 F.2d at 381.

The government has not met its burden of proof on risk of flight. Parker has strong ties to the community and his criminal record consists mainly of older cases. As explained above, the Court is not convinced that the defaults on his record demonstrate a pattern of willfully failing to appear.

The Court finds, however, that the government has met its burden on the issue of the safety of the community, and notes that even without the rebuttable presumption in play, as it is here, the Court would reach the same conclusion. Notwithstanding the forceful arguments of defense counsel, the case against Mr. Parker concerning the possession of ammunition is strong. In addition, while he may "only" be charged with

---

[5] One offense is the school zone drug distribution conviction, mentioned above, and the other is assault and battery on a police officer.

unlawfully possessing ammunition, the facts alleged by the government surrounding that charge, relating to trafficking in firearms, are supported by compelling evidence, including police surveillance, records pertaining to Parker's renting hotel rooms, observations by cooperating witnesses, and Parker's fingerprint on a box of ammunition purchased during one of the trips to New Hampshire to acquire firearms. That evidence demonstrates that Parker participated in illegally bringing over 20 firearms into Boston. At least two of these guns apparently were quickly distributed and wound up in the hands of known gang members. This scheme was a severe threat to public safety.

In sum, the government has met its burden of proof to establish by clear and convincing evidence that Parker poses a danger such that no condition or combination of conditions can reasonably assure the safety of the community. 18 U.S.C. § 3142(e).

## ORDER OF DETENTION PENDING TRIAL

In accordance with the foregoing memorandum, IT IS ORDERED:

1. That Shayne Parker be committed to the custody of the Attorney General or his designated representative, for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

2. That he be afforded a reasonable opportunity for private consultation with counsel; and

3. That on order of a court of the United States or on request by an attorney for the

Government, the person in charge of the corrections facility in which he is detained and confined shall deliver him to an authorized Deputy United States Marshal for the purpose of any appearance in connection with a court proceeding.

RIGHT OF APPEAL

THE PERSON OR PERSONS DETAINED BY THIS ORDER MAY FILE A MOTION FOR REVOCATION OR AMENDMENT OF THE ORDER PURSUANT TO 18 U.S.C. § 3145(b).

/s/ M. Page Kelley
M. PAGE KELLEY
United States Magistrate Judge